# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

ECOLAB INC. and NALCO COMPANY,
LLC d/b/a NALCO WATER, AN
ECOLAB COMPANY and/or NALCO
WATER

     *Plaintiffs*,

v.

ANTHONY RIDLEY and CHEMTREAT,
INC.

     *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:22-cv-50

Judge Travis R. McDonough

Magistrate Judge Susan K. Lee

---

## MEMORANDUM OPINION

---

Before the Court are cross-motions for summary judgment filed by Plaintiffs Ecolab, Inc.

("Ecolab") and Nalco Company, LLC ("Nalco") (collectively, "Ecolab/Nalco"), Defendant

Anthony Ridley, and Defendant ChemTreat, Inc. ("ChemTreat"). (Docs. 255, 259, 262.) For the

following reasons, the Court will: (1) **GRANT IN PART** and **DENY IN PART** ChemTreat's

motion for summary judgment (Doc. 255); (2) **GRANT IN PART** and **DENY IN PART**

Ridley's motion for summary judgment (Doc. 259); and (3) **GRANT IN PART** and **DENY IN

PART** Ecolab/Nalco's motion for partial summary judgment (Doc. 262).

## I.     BACKGROUND

Among other things, Ecolab/Nalco[1] monitors and controls the performance of industrial

water-treatment systems for its clients and works with those clients to develop solutions for their

---

[1] Nalco is a division of Ecolab, with each company providing distinct services.

water needs. ChemTreat also provides industrial water-treatment services and competes with Ecolab/Nalco.

Nalco hired Ridley as an account manager in 1999. (Doc. 255-2, at 564–65.) After working in that position for almost sixteen years, Ridley became a district manager for Nalco, managing a group of salespeople, engineers, and service technicians. (Doc. 229, at 6; Doc. 247, at 10.) Ridley testified that, between 2015 and 2018, while working for Nalco, he downloaded full and partial backups of his company-issued laptop to a personal external hard drive—the "WD Drive." (Doc. 255-2, at 526–27, 529–31 636–37.) Ridley also testified that he last saved Ecolab/Nalco information to the WD Drive sometime in 2020 and that he performed his last full back-up of his computer sometime in 2017 or 2018. (*Id*. at 530–31.) Ridley periodically used a company-issued external hard drive (the "LaCie Drive") to back up files and stored company documents on Ecolab/Nalco's OneDrive, a cloud-based storage platform. (*See* Doc. 255-2, at 525–27, 554.)

In 2019, Ridley began discussing potential employment opportunities with ChemTreat, primarily with ChemTreat employee Clay Cissell, and, in August 2020, Ridley sent his resume to Cissell. (*Id*. at 2.) Nonetheless, in October 2020, Ridley transferred from his district-manager position with Nalco to a corporate-account-manager position with its parent company, Ecolab. (*Id*. at 524, 557.) In conjunction with his move to Ecolab, Ridley executed an "Employee Sales, Service, Marketing & Inventions Agreement" (the "Ecolab Employment Agreement"). (*Id*. at 53–57, 503–04.) In relevant part, the Ecolab Employment Agreement prohibited Ridley from disclosing Ecolab/Nalco's trade secrets and confidential information:

> 2. Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing,

2

business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

> (a) derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (b) is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

(*Id*. at 53–57.) The Ecolab Employment Agreement further restricts use of company confidential information[2] for three years following separation of employment and includes the following restrictions regarding competition and solicitation of Ecolab/Nalco customers:

> 6. During employment with the Company and for a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not:

> (a) solicit, encourage or induce any customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding

---

[2] The Ecolab Employment Agreement defines "Confidential Information" as the "Company's confidential data or information which is valuable to the Company but substantially inaccessible to the public and to competitors of the Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets." (Doc. 255-2, at 54.)

3

the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service;

(b) transact business with any Customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service.

During said one (1) year following termination, the employee also will not assist any Competing Firm to engage in the aforementioned activities prohibited by Subsections 6(a) and 6(b). A Competing Firm means any person or organization (including one owned in whole or in part by the Employee) which is engaged in the development, production, use, marketing or sale of a Competing Product or Competing Service. A Competing Product or Competing Service means any product or service which is the same as, or similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the Employee, or by persons supervised by the Employee, during Employee's last year of employment with the Company. If the Employee violates the covenants contained in this Section, the term of said covenant shall be extended for one (1) year from and after the later of (a) the date on which the Employee permanently ceases such violation; or (b) the date on which any court issues an order or judgment enforcing the covenant; provided, that in no event shall the term of the covenant be extended for a term beyond twenty-four (24) months following termination of the Employee's employment with the Company.

(*Id*.) The Ecolab Employment Agreement also prohibited Ridley from soliciting Ecolab/Nalco employees he "managed, supervised, or had material contact with" to terminate their relationship with the company for one year after his separation and requiring Ridley to return all company property and information upon termination of employment. (*Id*. at 54, 56–57.) The Ecolab Employment Agreement further gave Ecolab the right to conduct a forensic examination of any "computer and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions." (*Id*.) Finally, the agreement specified that, "in any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements." (*Id*. at 56.)

When Ridley moved to his account-manager position at Ecolab, he continued to use the company OneDrive account to store company files. (Doc. 255-2, at 554.) Specifically, Ridley stored customer files, including service reports, business reviews, proposals, and other general customer information, dating back to 1999 in a OneDrive folder titled "Ridley Documents." (Doc. 255-2, at 563–66.)

Around the time he moved to the corporate-account-manager position at Ecolab, Ridley helped recruit Tyler Bates to work for Nalco and continued to communicate with him after Bates began working for Nalco in January 2021. (*Id.* at 58–60, 199, 217–239, 656–59.) Between September 2020 and February 2021, Ridley and Bates exchanged text messages discussing an open Nalco sales representative job, the interview process, Bates's work at Nalco, and various personal matters. (*Id.* at 217–243.) Ridley did not, however, manage or supervise Bates while Ridley was employed by Ecolab/Nalco (*id.* at 655–59), and Corey Demarco, Nalco's Vice President of Sales, also testified that Ridley did not supervise or manage Bates and that he did not know if Ridley had material contact with him while employed by Ecolab/Nalco. (*Id.* at 313–14.)

Throughout the remainder of 2020 and into 2021, Ridley continued discussions about potential employment with ChemTreat, including providing ChemTreat with a copy of his Ecolab Employment Agreement. (*Id.* at 3–9, 278.) After reviewing the agreement, ChemTreat determined that it could hire Ridley without him violating the agreement, as long as he "only engaged with customers outside those he had interaction with" in the twelve months preceding his departure from Ecolab/Nalco. (*Id.* at 23–24, 278–79, 285).

On February 3, 2021, Cissell asked Ridley to provide a three-year business plan projecting his anticipated sales over that period. (*Id.* at 240.) Cissell testified that he asked for

the business plan because he liked "using reps estimates to put together their compensation model." (*Id*. at 240, 282–83.) On March 2, 2021, Ridley provided Cissell with a business plan for his anticipated sales between 2021 and 2023 using revenue figures ChemTreat provided. (Doc. 255-2, at 10–13, 284–87, 598, 602–03; Doc. 275, at 10–13.) Ridley testified that, to create this forecast, he modified an Excel template created by a former Nalco employee. (Doc. 255-2, at 594–606.) Ridley also testified that no one at ChemTreat asked him to use a Nalco template, and he explained that he "just grabbed [a] template that [he] had used in the past for forecasting that had been modified," and "it just happened to be the one [a former Nalco employee] created." (*Id*. at 607.) Cissell testified that he did not recognize the forecast to be a "Nalco document" and that it was just "an Excel document that [Ridley] chose to send [him] his forecast in." (Doc. 255-2, at 288.)

Additionally, during the interview process, Cissell and Steve Leavell, ChemTreat's Vice President of Sales for Eastern North America, communicated to Ridley that, if hired, he should not bring any Ecolab/Nalco documents with him to ChemTreat. (*Id*. at 280–81, 285, 291–93, 638–39, 717.) According to Leavell, ChemTreat had "no expectation that [Ridley] would bring in Nalco or Ecolab business" to ChemTreat; rather, it expected Ridley "to grow [his] business . . . in such a way that [he was] fully, legally compliant with [his] previous employer's regulations, employment agreement, as well as being compliant with the covenants of conduct and so for that exist in ChemTreat." (*Id*. at 491.) According to Ridley, he understood these restrictions and accounted for them in projecting his anticipated sales at ChemTreat. (Doc. 255-2, at 593–94.)

On May 24, 2021, May 25, 2021, May 26, 2021, and June 1, 2021, while still employed by Ecolab, Ridley transferred thousands of Nalco files from the company OneDrive account to the LaCie Drive, including training documents and "Fact Packs" that included "revenue and

6

profit dollar information." (*Id*. at 567–75, 577, 710.)  According to Ridley, he moved these files

from the company OneDrive account to the LaCie Drive because "they were no longer needed

with [his] primary job" at Ecolab, and he wanted to "segregate them so they would be properly

housed in one area." (*Id*. at 568.)  Ridley also deleted documents that he saved to the LaCie

Drive from the company OneDrive in May and June 2021. (*Id*. at 710–11.)

On June 18, 2021, ChemTreat made Ridley an offer of employment. (*Id*. at 25.) The next

day, Ridley executed a ChemTreat "Certification of Compliance of Obligations to Prior

Employers," in which he certified, among other things, that he: (1) would not disclose to

ChemTreat or use in his work at ChemTreat "any confidential information and/or trade secrets

belonging to others, including [his] prior employers"; (2) has "returned to [his] prior employer

all hard copies of and electronic version of confidential information of [his] prior employer" and

has "not copied, downloaded, removed or e-mailed to [him]self improperly any confidential

information belonging to [his] prior employer"; (3) has "not retained any confidential

information, records or documents in hard copies or an electronic format from a prior employer";

and (4) understands that he "may be subject to discipline, including termination of [his]

employment with [ChemTreat] if [he] falsely certified the information herein or [did] not follow

the certifications [he] made herein." (*Id*. at 1, 291–93.)  Ridley ultimately accepted ChemTreat's

offer of employment on June 20, 2021. (*Id*. at 25.)  Around this time, Ridley downloaded his

entire Outlook contacts list to a thumb drive. (*Id*. at 583–87.)  Ridley testified that he

downloaded his contacts because "the majority of those were personal contacts, not business, and

[he] would like to have kept those contacts . . . when [he] left Ecolab." (*Id*. at 584–85.)  Ridley,

however, acknowledged that the contacts he downloaded included customer contact information.

(*Id*.)

Ridley gave Ecolab/Nalco notice that he had accepted a position with ChemTreat on July 1, 2021.  (*Id*. at 51, 460–61.)  When Ecolab/Nalco learned that Ridley was "going to the competition," they immediately terminated his employment and took away his access to Ecolab/Nalco's systems.  (*Id*. at 51, 215–16.)  That same day, employees in Ecolab/Nalco's human-resources department consulted with in-house counsel about the possibility of litigation.  (*Id*. at 742.)  Ecolab also analyzed Ridley's data-transfer activity and created a Digital Guardian Data Loss Prevention Report, which detailed all of Ridley's data transfer leading up to his termination.  (*Id*. at 431–32.)

Ridley began working for ChemTreat on July 2, 2021, and shortly thereafter coordinated the return of his Ecolab computer and accessories.  (*Id*. at 244–47, 284, 294, 651.)  Ridley sent his computer, a mobile drive, and other equipment to Ecolab's information-technology vendor, Insight, and Insight confirmed receipt of the items Ridley sent on July 12, 2021.  (*Id*. at 73, 446, 554.)  According to Ridley, he returned "everything that [he] knew he had at the time."  (*Id*. at 514.)  During his deposition, however, Ridley testified that he eventually found three Nalco thumb drives and the WD Drive, which still contained Ecolab/Nalco information, including several complete backups of Ecolab/Nalco files from the company-issued computer, as well as company files he admitted putting on the WD Drive in 2020.  (*Id*. at 514–15, 536, 546.)

On September 29, 2021, while employed by ChemTreat, Ridley e-mailed an Ecolab/Nalco document titled "AEDC proposal for purchasing–HVAC Cooling Towers–October2015.doc" from his personal e-mail account to his ChemTreat e-mail account.  (*Id*. at 27.)  This document is a letter written by Ridley in response to a Request for Quotation for an HVAC water treatment program and includes a description of Nalco's water-treatment program for cooling towers.  (*Id*. at 29–35.)  Although he acknowledged that he sent the document from

his personal e-mail to his ChemTreat e-mail and that he likely got it from the WD Drive, Ridley described the document as "useless," noting that the quotation was written for a company that no longer exists and that Nalco no longer sells the product in the bid. (*Id*. at 643–44.)

Ridley also admitted to accessing Ecolab/Nalco documents from the WD Drive in August 2021, September 2021, and January 2022. (*Id*. at 515–19.) According to Ridley:

> I found some documents. They were checked to see if the – I was surprised to find the documents on there, because the WD was used at times – I've had this WD drive for years, and it was used to back up my computer before Nalco – and I say Nalco specifically, before Nalco was even purchased by Ecolab. It was used to back up my company computer, and it was used as essentially a dump. I would grab – I would grab files in – from my – from my PC file explorer, drag and dump to what was essentially usually my D drive, or the – WD –
>
> . . .
>
> And that WD was very, very, very rarely hooked up to my computer. It was not something – it was a remote, just an external backup. It was mostly used to dump pictures. The main purpose was to use to dump pictures, videos of a personal nature, a storage device for the many pictures that we all take of family, friends, outings, and videos. That was its main purpose. But because of its size, it was able to handle a dump of data.
>
> When I hooked to it to look at pictures, I discovered some files. They were checked to confirm the file name was actually the file and wasn't something that was overwritten with the wrong file name. And then I found it and deleted the – all the files that were in – all the files that were found at the time. I only checked one or two, though.

(*Id*. at 516–18.) In total, Ridley accessed at least seven Nalco documents from his ChemTreat computer. (*Id*. at 613.) Additionally, Ridley admitted to deleting Ecolab/Nalco documents from his WD Drive during his employment at ChemTreat. (*Id.* at 515, 532–33.) Nonetheless, Ridley denied saving any documents from the WD Drive to his ChemTreat computer (*id*. at 541), denied e-mailing documents from the WD Drive to any other ChemTreat employee (*id*. at 541), and denied telling anyone at ChemTreat about the Ecolab/Nalco documents on the WD Drive (*id*. at 543, 716–17).

9

On February 9, 2022, Ecolab/Nalco sent demand letters to ChemTreat and Ridley accusing Ridley of, among other things, downloading or copying Ecolab's proprietary, confidential, and trade-secret information in the weeks leading up to his resignation. (*Id*. at 37–41.) Upon receipt of the letters, Ridley e-mailed Cissell stating that he did not "have any files from Ecolab or Nalco Water that contain proprietary information, classified information, trade secrets, or pricing information" in his possession. (*Id*. at 36; *see also id*. at-540–43.) ChemTreat responded to Ecolab/Nalco's demand letters, explaining that Ridley still possessed two thumb drives and a personal hard drive he used to back up his Nalco laptop, but that it would ask him to return the thumb drives and that he deleted all Ecolab/Nalco data from the personal hard drive. (Doc. 242-7.)

ChemTreat also investigated Ecolab/Nalco's misappropriation allegations and identified the Nalco document that Ridley e-mailed from his personal e-mail account to his ChemTreat e-mail account on September 24, 2021. (Doc. 255-2, at 28–35, 641–44.) ChemTreat ultimately terminated Ridley's employment on March 18, 2022, finding that his conduct violated ChemTreat's policies and the certification he signed upon accepting employment with ChemTreat. (*Id*. at 272–73, 647–50.) ChemTreat notified Ecolab/Nalco of Ridley's termination on March 18, 2022.[3] (*Id*. at 683–84.)

Ecolab/Nalco initiated the present action against Ridley and ChemTreat on March 3, 2022 (Doc. 1), and filed their third amended complaint on April 24, 2023 (Doc. 229). In the third amended complaint, Ecolab/Nalco assert claims against ChemTreat and Ridley for: (1) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1831, *et seq*.; (2) violation of

---

[3] Around this time, Tyler Bates left Nalco to joint ChemTreat. (Doc. 304-4, at 35.)

the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, *et seq*.; and (3) civil conspiracy. (Doc. 229, at 47–65.) Ecolab/Nalco separately assert claims against ChemTreat for tortious interference with contractual relationships and procurement of breach of contract and assert claims against Ridley for breach of contract and breach of fiduciary duty. (*Id*.) Ridley has asserted a counterclaim for attorneys' fees against Ecolab/Nalco, alleging they brought their misappropriation-of-trade-secrets claims against him in bad faith. (Doc. 247, at 95–99.)

Now before the Court are the parties' cross-motions for summary judgment. (Docs. 255, 259, 262.) Evaluating the merits of the parties' cross-motions for summary judgment, however, like everything else in this case, has been made significantly more difficult because of the parties' decisions and conduct leading up to the filing of this case, throughout discovery, and at every turn in litigation. As just one example, during discovery, Ecolab/Nalco requested to inspect the WD Drive, but Ridley objected, and Ecolab/Nalco filed a motion to compel, which the Court granted. (*See* Docs. 224, 246.) Ecolab/Nalco now asserts that Ridley's objection supports their claim that Ridley breached his contract with them because the Ecolab Employment Agreement gives Ecolab the right to conduct a forensic examination of any "computer and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions." (Doc. 255-2, at 54, 56–57.) In this case, even discovery disputes create new substantive claims.

Additionally, at the time the parties filed their cross-motions for summary judgment, they also filed cross-motions for spoliation sanctions, asserting that Ecolab/Nalco, ChemTreat, and Ridley all failed to preserve relevant evidence at a time they were under an obligation to do so. (Docs. 261, 276, 292.) On August 1, 2023, the Court entered a memorandum and order granting

in part the cross-motions for spoliation sanctions, finding that Ecolab/Nalco, ChemTreat, and Ridley all spoliated evidence.[4]  (Doc. 349.)  Specifically, the Court found, among other things, that:  (1) Ecolab/Nalco failed to preserve a laptop and an external hard drive (which Ridley contends was the LaCie Drive) that Ridley returned to Ecolab/Nalco after his termination and the electronically-stored information on those devices (*id*. at 21–27); (2) ChemTreat failed to preserve Ridley's ChemTreat-issued laptop and electronically-stored information on that laptop (*id*. at 27–30); (3) Ridley deleted electronically-stored information from two Nalco USB drives after receiving Ecolab/Nalco's evidence-preservation letter (*id*. at 30–33); and (4) Ridley ran a software program called "CCleaner" on the WD Drive after receiving Ecolab/Nalco's evidence-preservation letter, which permanently deleted certain files on the WD Drive (*id*.).  As the Court noted in ruling on the parties' cross-motions for spoliation sanctions, the parties' destruction of physical evidence and electronically-stored information has severely curtailed their ability and the Court's ability to identify with any certainty what documents and information Ridley took from Ecolab/Nalco and how Ridley used any of the documents and information in his possession while employed by ChemTreat.[5]

---

[4] Although the Court will not recount the factual background underlying its ruling on the cross-motions for spoliation sanctions, that factual background is hereby incorporated by reference. (Doc. 349, at 2–17.)

[5] To cure some of the prejudice caused by the parties' spoliation, the Court reopened discovery on a limited basis and appointed a special master who was tasked with, among other things, overseeing production and review of certain devices and electronically-stored information. (Doc. 361.)  On November 17, 2023, the Special Master filed his report, finding, among other things, that:  (1) Ridley's wife's computer was used to access information from the WD Drive in August 2021 and September 2021; (2) forensic analysis of Ridley's iPad did not reveal any files of relevance; (3) no responsive information was found in searching the hard drives of Clay Cissell, Tyler Bates, and Steve Leavell; (4) no evidence of problematic deletion was found on the hard drives of Clay Cissell, Tyler Bates, and Steve Leavell, and their hard drives did not contain any identifiable traces of Ecolab or Nalco confidential documents; (5) a search of Clay Cissell, Tyler Bates, and Steve Leavell's e-mails containing the terms "Ecolab" or "Nalco" did not reveal "content probative to the issues in this case"; (6) text messages sent from Ridley's iPad "do not

Despite these evidence-preservation failures, Ecolab/Nalco asserts that, at a minimum, Ridley took the following documents and categories of information, all of which constitute trade secrets entitled to protection under the DTSA and the TUTSA: (1) compilations of Ecolab/Nalco customer files and documents that Ridley maintained on OneDrive; (2) individual documents that contain details about services, products, pricing, and estimated client usage; and (3) training documents. (Doc. 255-2, at 724–27.)

Complicating matters further, it is unclear whether Ecolab/Nalco have sustained any actual loss as a result of Ridley's and ChemTreat's actions. In their initial disclosures made pursuant to Federal Rule of Civil Procedure 26(a), Ecolab/Nalco stated that they "are claiming damages but are in the process of quantifying their damages" and that they would "supplement their Initial Disclosures once the computation is complete."[6] (*Id*. at 692.) During discovery, however, it became clear that Ecolab/Nalco does not possess any evidence suggesting that Ridley solicited Ecolab/Nalco customers while employed by ChemTreat or that ChemTreat used information taken by Ridley to solicit Ecolab/Nalco customers. When asked if Ecolab/Nalco had any factual basis for believing that Ridley solicited a customer of Ecolab in violation of the Ecolab Employment Agreement, Demarco responded: "I don't think we're arguing that he– whether he solicited a customer or not. I think we are questioning whether–we're questioning the amount of confidential information he took." (Doc. 255-2, at 315.) Additionally, as it relates

---

appear probative of Ridley transferring Ecolab/Nalco information to ChemTreat"; (7) review of user data from Ridley and ChemTreat devices using a variety of searching, sampling and other review strategies, did not reveal any responsive documents; (8) "[n]o evidence was found showing that Ridley transferred Ecolab/Nalco files to ChemTreat on ChemTreat computers that were reviewed; and (9) review of network file shares did not reveal any responsive documents. (*See generally* Doc. 413.) On December 18, 2023, the Court overruled the parties' objections to the Special Master's report. (Doc. 419.)

[6] It is unclear to the Court whether Ecolab/Nalco ever supplemented their initial disclosures.

to their misappropriation-of-trade-secrets claims and whether Ecolab/Nalco lost customers or business, Demarco testified that Ecolab/Nalco is not "claiming any damages at this time."  (Doc. 255-2, at 317, 320–339.)  Nevertheless, Ecolab/Nalco served an expert report from Dana Trexler, a certified public accountant, which purported to quantify Ecolab/Nalco's damages based on the value of the allegedly misappropriated customer information to ChemTreat.  (*See* Doc. 275-3.) Although the value of misappropriated information to the misappropriating party is an accepted method for calculating a misappropriating party's unjust enrichment, the Court excluded Trexler's opinions under Federal Rule of Evidence 702, finding that her methodology attempting to quantify unjust-enrichment damages was not reliable or helpful to the trier of fact.  (Doc. 353.)

Against this factual and procedural background, the parties' cross-motions for summary judgment are ripe for the Court's review.

## II.      STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case.  *Celotex*, 477 U.S. at 325.

Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

The standard of review when parties file cross-motions for summary judgment is the same as when only one party moves for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). When there are cross-motions for summary judgment, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* In considering cross motions for summary judgment, the court is "not require[d] . . . to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

## III. ANALYSIS

Ridley and ChemTreat have moved for summary judgment on Ecolab/Nalco's claims against them for misappropriation of trade secrets and civil conspiracy, arguing that the undisputed evidence demonstrates that these claims fail as a matter of law. (Doc. 256, at 8–22, 30; Doc. 260, at 18–29.) ChemTreat has separately moved for summary judgment on

Ecolab/Nalco's claims against it for tortious interference with contractual relationships and procurement of breach of contract (Doc. 256, at 24–29), and Ridley has moved for summary judgment on Ecolab/Nalco's claims against him for breach of contract and breach of the fiduciary duty of loyalty (Doc. 260, at 7–18). Ecolab/Nalco have moved for partial summary judgment against Ridley,[7] arguing that the undisputed evidence demonstrates that he breached the Ecolab Employment Agreement. (Doc. 264, at 12–14.) Finally, Ecolab/Nalco have moved for summary judgment on Ridley's counterclaim for attorneys' fees based on his allegations that Ecolab/Nalco brought their misappropriation-of-trade-secrets claim against him in bad faith. (*Id.*, at 14–16.)

Before addressing the merits of the parties' arguments, the Court must first address the effects of the parties' spoliation on their respective motions for summary judgment, especially as it relates to Ecolab/Nalco's misappropriation-of-trade-secrets claims. As the Court explained in its August 1, 2023 memorandum and order (Doc. 349), there is a significant evidentiary gap caused by the parties' failure to preserve evidence at a time that they were under an obligation to do so. (*Id.*) Neither the Court nor the parties have the benefit of knowing precisely what Ridley downloaded to the LaCie Drive or what he did with that information because Ecolab/Nalco failed to preserve it, even though they were reasonably anticipating litigation. (*Id.*) ChemTreat, for its part, negligently wiped Ridley's company-issued laptop, thereby depriving the parties and the Court of evidence regarding what Ridley did, if anything, with Ecolab/Nalco documents and information in his possession while working for ChemTreat. (*Id.*) And Ridley egregiously

---

[7] Ecolab/Nalco have not moved for summary judgment on any of their claims against ChemTreat. (*See generally* Doc. 264.)

wiped information from the WD Drive immediately after receiving an evidence preservation letter from Ecolab/Nalco. (*Id*.)

Given this evidentiary gap, assessing whether genuine issues of material fact remain as to whether Ridley and ChemTreat misappropriated Ecolab/Nalco's trade secrets is quite a difficult task. Undaunted, Ridley and ChemTreat argue that they are entitled to summary judgment on Ecolab/Nalco's misappropriation claims primarily because Ecolab/Nalco have not sufficiently identified the trade secrets at issue or that they misappropriated any trade secrets based on the limited universe of evidence that remains. Effectively, they argue that, even though they failed to preserve evidence that would be relevant to whether Ridley and ChemTreat improperly acquired and used or disclosed Ecolab/Nalco's trade-secret information, they are entitled to summary judgment because Ecolab/Nalco cannot identify with specificity documents and information entitled to trade-secret protection or explain how Ridley and ChemTreat misappropriated that information.

In its memorandum and order finding that the parties spoliated evidence, the Court specifically found that Ecolab/Nalco and ChemTreat's spoliation was not intentional and was the result of mere negligence. (*See generally* Doc. 349.) The Court also found that Ridley's conduct was certainly negligent and possibly intentional. (*Id*. at 30–33.) To cure some of the prejudice caused by the parties' spoliation, the Court reopened discovery on a limited basis and appointed a special master to oversee production and review of certain documents and information. (Doc. 361.) The Court, however, left open the question of whether it would impose additional spoliation sanctions at trial.

Because Ecolab/Nalco and ChemTreat's spoliation of electronically-stored information was negligent, the Court is limited to imposing sanctions "no greater than necessary to cure the

prejudice" caused by the spoliation. Fed R. Civ. P. 37(e)(1). At least as it relates to

Ecolab/Nalco and ChemTreat, the Court cannot "instruct the jury that it may or must presume the

information was unfavorable to the [spoliating] party," because their spoliation was not

intentional. Fed. R. Civ. P. 37(e)(2)(B). Nonetheless, as the advisory committee notes to Rule

37 explain, "[t]he range of such measures" to cure prejudice is "quite broad" and may include

"forbidding the party that failed to preserve information from putting on certain evidence,

permitting the parties to present evidence and argument to the jury regarding the loss of

information, or giving the jury instructions to assist in its evaluation of such evidence or

argument, other than instructions to which subdivision (e)(2) applies." Fed. R. Civ. P. 37

advisory committee's note to 2015 amendment.

   To further cure the prejudice caused by the parties' spoliation, the Court will permit the

parties to present evidence and argument to the jury regarding loss of information in this case

and instruct the jury that it may give that evidence whatever weight it deems appropriate.[8] *See*

*id.*; *see also Hargis v. Overton Cnty., Tenn.*, No. 2:22-cv-00011, 2023 WL 8604139, at \*15

(M.D. Tenn. Dec. 12, 2023); *EPAC Techs., Inc. v. Thomas Nelson, Inc.*, No. 3:12-cv-00463,

2018 WL 3322305, at \*3 (M.D. Tenn. May 14, 2018). While the Court will be careful to ensure

that its jury instruction does not impermissibly cross the line into permissive or mandatory

adverse-inference instructions for intentional spoliation under Rule 37(e)(2), the natural

consequence of permitting the parties to put on evidence and argument regarding loss of

information and instructing the jury that it may give that evidence and argument whatever weight

---

[8] The Court notes, however, that it intends place significant limitations on the manner in which
spoliation evidence is presented to the jury, as well as the time devoted to the parties'
presentation of spoliation evidence at trial. The Court will discuss the specifics of these
limitations at the final pretrial conference.

it deems appropriate is that the jury may make reasonable inferences that flow from evidence regarding the parties' spoliation. The jury may decide to give such evidence no weight at all, but it would certainly be reasonable for the jury to make negative inferences about the circumstances that led to the loss of relevant information, even if the Court's spoliation instruction to the jury is neutral as to how the jury should consider such evidence. Against this backdrop of the evidentiary oddities at work in this case, the Court will evaluate the parties' cross-motions for summary judgment.

### A. Misappropriation of Trade Secrets under the DTSA and the TUTSA

ChemTreat argues that Ecolab/Nalco's misappropriation-of-trade-secrets claims under the DTSA and the TUTSA fail as a matter of law because: (1) Ecolab/Nalco have not established the existence of a trade secret; (2) Ecolab/Nalco have not proffered evidence that ChemTreat misappropriated any of their trade secrets; (3) it is not vicariously liable for Ridley's conduct; and (4) Ecolab/Nalco cannot establish damages. (Doc. 256, at 13–29.) Ridley has also moved for summary judgment on Ecolab/Nalco's misappropriation-of-trade-secrets claims, arguing that Ecolab/Nalco have not sufficiently identified any trade secrets entitled to protection and have not proffered evidence that he used, disclosed, or improperly acquired any of Ecolab/Nalco's trade secrets. (Doc. 260, at 18–27.) Ecolab/Nalco have moved for partial summary judgment on Ridley's claim that they are entitled to attorneys' fees because they brought their misappropriation claims in bad faith. (Doc. 264, at 14–16.)

### i. *Existence of Trade Secrets and Use, Disclosure, or Improper Acquisition*

ChemTreat and Ridley first argue that they are entitled to summary judgment on Ecolab/Nalco's misappropriation-of-trade-secrets claims because Ecolab/Nalco have not sufficiently identified documents and information entitled to trade-secret protection under the DTSA and the TUTSA. (Doc. 256, at 13–19; Doc. 260, at 21–27.) They also argue that

Ecolab/Nalco have not proffered sufficient evidence from which a reasonable jury could conclude that they used, disclosed, or improperly acquired Ecolab/Nalco's trade-secret information. (Doc. 256, at 19–26; Doc. 260, at 18–21.)

Claims under the DTSA and the TUTSA have "largely the same" elements, and their definitions of the relevant terms are similar. *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 602 F. Supp. 3d 1059, 1065 (M.D. Tenn. 2022) (citing *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, No. 3:19-CV-00966, 2019 WL 5964531, at *5 (M.D. Tenn. Nov. 13, 2019)). "[T]he elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011); *see also BNA Assocs., LLC*, 602 F. Supp. 3d 1059, 1065 (noting that the elements of a DTSA claim are "largely the same as the elements of a TUTSA claim").

Under the DTSA,

the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The TUTSA similarly defines "trade secret" as:

information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). The Sixth Circuit has directed courts to consider the following factors in determining whether information qualifies as a trade secret: "the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007) (citing *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)).

Additionally, to prove a misappropriation-of-trade-secrets claim under the TUTSA or the DTSA, a plaintiff must demonstrate that a defendant misappropriated trade secrets. Under the TUTSA, "misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (i) Used improper means to acquire knowledge of the trade secret; or
> >
> > (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
> >
> > > (a) Derived from or through a person who had utilized improper means to acquire it;
> > >
> > > (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

Tenn. Code Ann. § 47-25-1702(2). Similarly, under the DTSA, "misappropriation" means:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > >
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > >
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> >
> > (iii) before a material change of the position of the person, knew or had reason to know that--
> >
> > > (I) the trade secret was a trade secret; and
> > >
> > > (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

In this case, the fact that Ridley and ChemTreat spoliated evidence creates genuine issues of material fact regarding whether Ridley and ChemTreat misappropriated Ecolab/Nalco information entitled to trade-secret protection. In its memorandum and order finding that Ridley and ChemTreat spoliated evidence, the Court noted, among other things, that: (1) in the months

leading up to terminating his employment with Ecolab, Ridley downloaded numerous Ecolab/Nalco documents to the LaCie Drive and a personally-owned Microsoft account; (2) after his termination Ridley returned to Ecolab some, but not all, electronic devices with Ecolab/Nalco information on them; (3) Ridley connected the WD Drive to his ChemTreat-issued laptop on multiple occasions and opened Nalco documents; (4) while employed by ChemTreat, Ridley sent a Nalco document from his personal e-mail account to his ChemTreat e-mail account; (5) Ridley ran a software program called CCleaner to wipe information from the WD Drive days after receiving an evidence preservation notice from Ecolab/Nalco; and (6) in March 2022, ChemTreat's information-technology department inadvertently wiped and reformatted Ridley's ChemTreat-issued laptop. (*See generally* Doc. 349.) In summary, Ridley had access to Ecolab/Nalco information stored on multiple devices while employed by ChemTreat, and some of the electronically-stored information on those devices was destroyed, either by Ridley or ChemTreat. The lack of that spoliated evidence bears directly on whether Ridley and ChemTreat possessed Ecolab/Nalco's trade secrets and, if so, how they used that information. A jury hearing evidence regarding this spoliation will necessarily have to make credibility determinations about witnesses' explanations for their behavior, and, depending on the evidence presented and witness credibility determinations, a jury could reasonably infer that Ridley and ChemTreat's spoliation suggests that one or both misappropriated Ecolab/Nalco's trade secrets. Accordingly, the Court will deny Ridley and ChemTreat's motion for summary judgment to the extent they argue that Ecolab/Nalco have not sufficiently identified the trade secrets at issue or that they have not proffered adequate proof of misappropriation.

>    *ii.*        ***Vicarious Liability***

ChemTreat next argues that it is entitled to summary judgment because the undisputed facts demonstrate that Ridley's actions were not taken in the course and scope of his employment with ChemTreat, and, therefore, it cannot be held vicariously liable for Ridley's misappropriation of trade secrets. (Doc. 256, at 21–22.)

Under Tennessee law, "[t]he doctrine of respondeat superior renders employers vicariously liable for the torts their employees commit while acting within the scope of their employment." *Wallace v. Leidos Innovations Corp.*, 805 F. App'x 389, 392 (6th Cir. 2020) (quoting *Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992)). To hold an employer liable, a plaintiff must prove: "(1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." *Id*.

For the same reasons discussed above, evidence regarding ChemTreat's spoliation creates genuine issues of material fact regarding whether Ridley misappropriated Ecolab/Nalco's trade secrets during the course and scope of his employment at ChemTreat. Again, a jury hearing evidence regarding ChemTreat's spoliation of electronically-stored information contained on Ridley's company-issued laptop will necessarily have to make credibility determinations about witnesses' explanations for their behavior and, depending on those credibility determinations, a jury could reasonably infer that ChemTreat's spoliation resulted in the destruction of evidence suggesting that Ridley took certain actions during the course and scope of his ChemTreat employment. Accordingly, the Court will deny ChemTreat's motion for summary judgment to the extent it argues that the undisputed evidence demonstrates that it is not vicariously liable for Ridley's alleged misappropriation of Ecolab/Nalco's trade secrets.

### iii.        *Damages*

ChemTreat and Ridley next argue that they are entitled to summary judgment on Ecolab/Nalco's misappropriation claims because Ecolab/Nalco have not proffered evidence that they sustained actual damages.  (Doc. 256, at 27–29; Doc. 260, at 10–14.)  The TUTSA and the DTSA both permit a court to award damages "for actual loss caused by the misappropriation of a trade secret" and for "unjust enrichment caused by the misappropriation of a trade secret."  18 U.S.C. § 1836(b)(3)(B); Tenn. Code Ann. § 47-25-1704.  Both statutes, however, also contemplate causes of action for acquisition of a trade secret by "improper means," independent of whether a defendant actually used the trade secret at issue.  *See* Tenn. Code Ann. 47-25-1702(2)(A); 18 U.S.C. § 1839(5)(B)(i).  In such situations, equitable relief in the form of an injunction against future use may remedy "actual or threatened misappropriation," even in the absence of actual use by the misappropriating party.  Tenn. Code Ann. § 47-25-1703(a); *see also* 18 U.S.C. § 1836(b)(3)(A).  Additionally, both the TUTSA and the DTSA permit the Court to award attorneys' fees to a prevailing plaintiff if the trade secret was willfully and maliciously misappropriated.  Tenn. Code Ann. § 47-25-1705; 18 U.S.C. § 1836(b)(3)(D).

In this case, ChemTreat and Ridley are correct that Ecolab/Nalco have not proffered any evidence suggesting that they have lost business or customers as a result of Ridley or ChemTreat's alleged misappropriation.  To the contrary, Ecolab/Nalco have repeatedly taken the position that they are not seeking damages from Ridley or ChemTreat based on lost customers or business.  (*See, e.g.*, Doc. 255-2, at 317, 320–339.)  Additionally, the Court excluded Ecolab/Nalco's expert who attempted to quantify "unjust enrichment" damages.  (Doc. 353.)  As a result, Ecolab/Nalco have not proffered any evidence from which a reasonable jury could conclude that they suffered actual damages or that Ridley and ChemTreat were unjustly enriched

by their alleged misappropriation. Nonetheless, if Ecolab/Nalco demonstrate that either Ridley or ChemTreat possess Ecolab/Nalco trade secrets, Ecolab/Nalco may be entitled to an injunction against future use of such information and may be entitled to an award of attorneys' fees upon a finding that any misappropriation was willful and malicious. Accordingly, ChemTreat and Ridley are not entitled to summary judgment on Ecolab/Nalco's misappropriation claims simply because Ecolab/Nalco have not proffered evidence from which a reasonable jury could conclude that they sustained actual damages or that Ridley and ChemTreat were unjustly enriched as a result of their alleged misappropriation.

### iv. Attorneys' Fees

In his answer, Ridley asserted a counterclaim for attorneys' fees, alleging that Ecolab/Nalco brought their misappropriation claims against him in bad faith. (Doc. 247, at 95–98.) Ecolab/Nalco have moved for summary judgment on Ridley's claim for attorneys' fees, arguing that the undisputed evidence demonstrates that their misappropriation claims were not brought in bad faith. (Doc. 264, at 14–16.) Under the TUTSA and the DTSA, the Court may award attorneys' fees to the defendant if he or she can demonstrate that the plaintiff asserted a misappropriation-of-trade-secrets claim in bad faith. Tenn. Code Ann. § 47-25-1705; 18 U.S.C. § 1836(b)(3)(D). Adopting the definition of "bad faith" set forth in Black's Law Dictionary, Tennessee courts have stated that, under the TUTSA, "bad faith" is defined as "dishonesty of belief or purpose," and explained that a claim that is "plausible" is not brought in bad faith. *Dominion Enters. v. Dataium, LLC*, No. M2012-02385-COA-R3CV, 2013 WL 6858266, at *14 (Tenn. Ct. App. Dec. 27, 2013); *see also Hinson v. O'Rourke*, No. M201400361COAR3CV, 2015 WL 5033908, at *6 (Tenn. Ct. App. Aug. 25, 2015).

In this case, even if Ridley prevails at trial, the Court would not find that Ecolab/Nalco brought their misappropriation-of-trade-secrets claims against him in bad faith. It is undisputed that: (1) prior to leaving Ecolab, Ridley downloaded over 16,000 Ecolab/Nalco documents; (2) he went to work for a direct competitor; (3) he accessed at least some of those documents while employed by ChemTreat; (4) he e-mailed an Ecolab/Nalco document from his personal e-mail account to his ChemTreat e-mail account; (5) he did not return all Ecolab/Nalco documents in his possession after his termination; and (6) he spoliated evidence after receiving an evidence preservation letter. Under these circumstances, Ecolab/Nalco's misappropriation-of-trade-secrets claims against Ridley were certainly plausible, which the Court previously found when it denied Ridley's motion to dismiss. (*See* Doc. 69.) Accordingly, the Court will grant Ecolab/Nalco's motion for partial summary judgment on Ridley's claims for attorneys' fees under the TUTSA and the DTSA.

**B.    Tortious Interference with Contracts and Procurement of Breach of Contract**

ChemTreat next moves for summary judgment on Ecolab/Nalco's claims against it for tortious interference with contract and procurement of breach of contract, arguing that Ecolab/Nalco have not proffered sufficient evidence from which a reasonable jury could find that there was an underlying breach of contract or that Ecolab/Nalco suffered any damages as a result of ChemTreat's alleged conduct. (Doc. 256, at 29–34.)

Tennessee Code Annotated § 47-50-109 provides that "[i]t is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto." Tennessee also recognizes a common-law claim for tortious interference with contract. *See Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 832 (E.D. Tenn. 2005). "[T]he common law action for

tortious interference with contract and the statutory action for unlawful procurement of breach of

contract, *see* Tenn. Code Ann. § 47-50-109, have the same elements and operate as alternative

theories of recovery."[9]  *Id.*  To succeed on either claim, a plaintiff must show:

> (1) that there was a legal contract; (2) that the wrongdoer had sufficient
> knowledge of the contract; (3) that the wrongdoer intended to induce its breach;
> (4) that the wrongdoer acted maliciously; (5) that the contract was breached; (6)
> that the act complained of was the proximate cause of the breach; and (7) that
> damages resulted from the breach.

*TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987) (citations omitted);

*Green v. Champs-Elysees, Inc.,* No. M2012-00082-COA-R3-CV, 2013 WL 10481171, *7 (Tenn.

Ct. App. Sept. 11, 2013); *Givens v. Mullikin ex rel. Est. of McElwaney*, 75 S.W.3d 383, 405

(Tenn. 2002).

Ecolab/Nalco first argue that the Court should deny ChemTreat's motion for summary

judgment because there is sufficient evidence from which a reasonable jury could conclude that

ChemTreat induced Ridley to violate the Ecolab Employment Agreement by soliciting Tyler

Bates to terminate his employment with Ecolab/Nalco and join ChemTreat.  (Doc. 304, at 20–

22.)  The Ecolab Employment Agreement provides:

> During Employee's employment with Company and for a period of one (1) year
> immediately thereafter, Employee will not hire or induce, attempt to induce or in
> any way assist or act in concert with any other person or organization in hiring,
> inducing or attempting to induce any employee or agent of the Company to
> terminate such employee's or agent's relationship with Company.  This restriction
> is limited to those employees that Employee managed, or supervised, or had
> material contact with on the Company's behalf during the last twelve (12) months
> of the Employee's employment with the Company.

---

[9] The elements for both forms of the action are identical, except that a plaintiff may recover
punitive damages in the common-law action instead of treble damages mandated by the statute.
Additionally, "the statutory claim is in the nature of a penalty, so it, unlike the common law
cause of action, requires a clear and convincing showing of defendant's liability rather than mere
proof by a preponderance of the evidence."  *Cambio Health Sols., LLC v. Reardon*, 234 F. App'x
331, 336 (6th Cir. 2007) (internal quotations omitted).

(Doc. 255-2, at 54, 56–57.)  As a result, this provision barred Ridley from soliciting Ecolab/Nalco employees who he "managed, supervised, or had material contact with on the Company's behalf" to terminate their relationship with the company from July 1, 2021 through June 30, 2022.

In this case, there is not sufficient evidence for a reasonable jury to conclude that ChemTreat induced Ridley to violate the employee non-solicitation provision of the Ecolab Employment Agreement by recruiting Bates to work for ChemTreat.  Ridley and Bates knew each other because Bates "joined the fraternity that [Ridley] joined when [he] was in college many years before [Bates]."  (Doc. 255-2, at 656.)  In October 2020, while Ridley was working for Ecolab, Ridley exchanged text messages with Bates about Bates seeking a sales-representative position with Nalco.  (Doc. 255-2, at 217–20.)  After Bates submitted an employment application, he continued to text with Ridley generally discussing the interview process at Nalco.  (*Id*. at 221–25.)  In November 2020, Bates received an offer of employment from Nalco, and began working for Nalco on January 4, 2021.  (*Id*. at 225–27.)  After Bates began working for Nalco, he texted Ridley with general questions about company training, whether he would be required to buy his own safety gear, unspecified test results, and personal matters, including whether Ridley would attend his wedding.  (*Id*. at 227–37.)

Even if Ridley solicited Bates to leave Nalco and work for ChemTreat,[10] the record is devoid of evidence from which a reasonable jury could conclude that Ridley supervised,

---

[10] Bates left his employment with Nalco to work ChemTreat in Spring of 2022.  (Doc. 304-4, at 35.)  Ridley also testified that he was present when Bates interviewed at ChemTreat and that he was the "go between" between Bates and Cissell.  (*Id*. at 46.)  Even viewing these facts in the light most favorable to Ecolab/Nalco, it would not change the Court's determination that there is insufficient evidence in the record for a reasonable jury to conclude that Ridley had "material contact" with Bates while Ridley was employed by Ecolab.

managed or had "material contact" with Bates on behalf of Ecolab/Nalco such that he breached the Ecolab Employment Agreement or that ChemTreat induced him to do so. The Ecolab Employment Agreement does not define "material," but Black's Law Dictionary defines "material" as "[h]aving some logical connection with consequential facts" or "[o]f such a nature that knowledge of an item would affect a person's decision-making; significant; essential." *See Black's Law Dictionary* (11th ed. 2019). Guided by these definitions, Ridley's text messages with Bates do not rise to the level of "material contact" on behalf of Ecolab/Nalco. Bates's general questions about the application and interview process and beginning work with Nalco were not consequential; rather, they were general questions, interspersed with discussions about personal matters, that did not ultimately impact Bates's or Ridley's actual work for Ecolab/Nalco. Moreover, Ecolab/Nalco corporate representative, Corey Demarco, testified that Ridley did not manage or supervise Bates, and that he did not know if Ridley had "material contact with Bates" while employed by Ecolab/Nalco. (Doc. 255-2, at 313–14.) Ridley similarly testified that he did not manage or supervise Bates while employed by Ecolab or Nalco. (*Id*. at 655–59). Such evidence, even viewed in the light most favorable to Ecolab/Nalco, is insufficient to create a genuine issue of material fact as to whether Ridley breached the Ecolab Employment Agreement and insufficient to create a genuine issue of material fact as to whether ChemTreat induced Ridley to breach the Ecolab Employment Agreement. Accordingly, the Court will grant ChemTreat's motion for summary judgment to the extent Ecolab/Nalco contends that ChemTreat tortiously interfered with existing contracts or procured Ridley's breach of contract in connection with hiring Tyler Bates.

Ecolab/Nalco next contend that ChemTreat induced Ridley to breach the Ecolab Employment Agreement by asking him to create a business plan forecasting his anticipated sales

if hired by ChemTreat. (Doc. 304, at 22–23.) Specifically, Ecolab/Nalco contend that, by asking Ridley to create a business plan, ChemTreat induced Ridley to breach the "duty of loyalty" contained in paragraph five of Ecolab Employment Agreement, which provides:

> The Employee shall perform such services as may be assigned to the Employee from time to time in accordance with the Company's policies and procedures. The Employee shall timely submit written sales and service reports using the Company's standard report forms. Employee will devote Employee's whole working time and ability to the services of the Company in such capacity as the Company from time to time shall direct. Employee further agrees that during the course of employment by the Company, Employee will not have any financial interest, whether direct or indirect, in any firm or organization engaged in competitive services or products. . . . Employee agrees to promptly disclose to the Company any conflict of interest or employment matter which may be adverse to the Company's interest.

(Doc. 255-2, at 54; *see also* Doc. 304, at 22–23.)

In this case, there is insufficient evidence in the record from which a reasonable jury could conclude that ChemTreat induced Ridley to breach paragraph five of the Ecolab Employment Agreement by asking him to provide a business plan forecasting anticipated sales if hired to work for ChemTreat. On February 3, 2021, Cissell texted Ridley: "Hey….could you put together a 3 yr business plan…..nothing fancy just an est[imate] of the $$ you can sell in year one, two and three…..I like using reps estimates to put together their compensation model." (Doc. 255-2, at 240.) Even assuming Cissell was familiar with Ridley's Ecolab Employment Agreement, nothing about his request for a business plan suggested that Cissell intended to induce Ridley to violate any of the requirements set forth in paragraph five of the Ecolab Employment Agreement. Cissell did not ask Ridley to work on the business plan during his Ecolab working hours, Ridley did not obtain a financial interest in ChemTreat, and the request did not require him to take any action that was adverse to Ecolab/Nalco's business interests. ChemTreat simply requested that Ridley forecast anticipated sales if hired and that request is divorced from any evidence from which a reasonable jury could conclude that Cissell intended

for Ridley to breach the Ecolab Employment Agreement by providing a business plan, that Cissell, acting on behalf of ChemTreat, acted maliciously, that Ridley breached the Ecolab Employment Agreement by providing the business plan, that Cissell's request proximately caused Ridley to breach the Ecolab Employment Agreement, or that Ecolab/Nalco suffered damages as result of Ridley's purported breach. *See TSC Indus., Inc.* 743 S.W.2d at 173. Accordingly, the Court will grant ChemTreat's motion for summary judgment on Ecolab/Nalco's tortious interference claims to the extent they are predicated on ChemTreat's request that Ridley provide it a business plan forecasting anticipated sales.

Finally, Ecolab/Nalco argues that the Court should deny ChemTreat's motion for summary judgment on their tortious-interference claims because their third amended complaint includes allegations regarding lawsuits Ecolab/Nalco initiated against former employees Jessica Grailer and Simon Walker after they resigned and went to work for ChemTreat and their corporate representative "provided testimony about each of the four cases" brought against former employees. (*See* Doc. 304, at 23–24; *see also* Doc. 229, at 31–33.) Ecolab/Nalco's corporate representative, however, did not provide any factual details regarding their claims against those former employees (*see* Doc. 304-4, at 17–20), and the record is otherwise devoid of any facts from which a reasonable jury could conclude that ChemTreat tortiously interfered with Jessica Grailer or Simon Walker's contracts with Ecolab/Nalco.

Accordingly, the Court will grant ChemTreat's motion for summary judgment on Ecolab/Nalco's claims against it for tortious interference with contract and procurement of breach of contract.

### C. Breach of Contract

Ecolab/Nalco have moved for summary judgment on their breach-of-contract claim against Ridley, arguing that the undisputed evidence demonstrates that he breached the Ecolab Employment Agreement by: (1) failing to return company property and information after his termination; (2) transferring company information to a personal computing device and deleting company information; (3) using or disclosing Ecolab/Nalco confidential information; and (4) refusing to allow Ecolab/Nalco to inspect the WD Drive during discovery. (Doc. 264, at 12–14.) Conversely, Ridley argues that he is entitled to summary judgment on Ecolab/Nalco's breach-of-contract claim because Ecolab/Nalco have not suffered any damages. (Doc. 260, at 7–10.)

"When a plaintiff alleges breach of contract, he or she is responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *Bancorp South Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). Where a party "substantially performed" under the contract, "ordinarily that party will not have liability for breach." *Hill v. Winnebago Indus., Inc.*, No. 3:17-CV-00678, 2018 WL 5721947, at *3, n.2 (M.D. Tenn. Nov. 1, 2018). "Substantial performance occurs where there has been no willful departure from the terms and no violation of an essential point." *Id.*; *see also Farmers Mut. of Tenn. v. Atkins*, No. E2014-00554-COA-R3-CV, 2014 WL 7143292, at *9 (Tenn. Ct. App. Dec. 15, 2014). Additionally, under Tennessee law, even if a plaintiff does not suffer monetary damages as a result of a defendant's breach of contract, the plaintiff may recover attorneys' fees as the prevailing party if the underlying contract provides for such recovery. *HCTec Partners, LLC v. Crawford*, 676 S.W.3d 619, 641 (Tenn. Ct. App. 2022).

In this case, Ridley does not dispute that the Ecolab Employment Agreement is an enforceable contract, but nonetheless contends that the Court should deny Ecolab/Nalco's motion

for summary judgment because genuine issues of material fact remain as to whether he breached the agreement.  (Doc. 287, at 8–22.)  Ridley executed the Ecolab Employment Agreement on September 16, 2020.[11]  (Doc. 255-2, at 53–57.)  Among other things, the Ecolab Employment Agreement specifically required Ridley:  (1) not to use or disclose company confidential information that he acquired as a result of his employment; (2) not to "transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so in writing by the Company"; (3) not to "wipe, delete, or transfer or cause any Company data to be wiped, deleted, or transferred from any such device before returning the device to the Company" as "soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end"; (4) to "return in good order all Company property and information in [his] possession, custody, or control" upon termination of his employment; (5) not to "erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company"[12]; and (6) to allow Ecolab/Nalco to conduct a forensic examination "of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions." (Doc. 255-2, at 53–57.)

---

[11] Ridley signed a separate employment agreement when he began working for Nalco in 1999 (Doc. 290, at 5–6), and Ecolab/Nalco's breach-of-contract claim is not based on any alleged breach of Ridley's 1999 Nalco Employment Agreement (*see generally* Doc. 229).

[12] The Ecolab Employment Agreement goes on to state:  "For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned phone and/or computer device."  (Doc. 255-2, at 56.)

In this case, the undisputed evidence demonstrates that Ridley breached some, but likely not all, of the foregoing contractual obligations. Ridley executed the Ecolab Employment Agreement on September 16, 2020. As a result, any actions that Ridley took prior to September 16, 2020, cannot supply the breach necessary find him liable for breaching the Ecolab Employment Agreement. Consequently, his transfer of Nalco company files to his personally-owned WD Drive, which he testified stopped prior to September 2020 (Doc. 255-2, at 524, 531), is not a breach of the Ecolab Employment Agreement.[13] Nonetheless, the undisputed evidence demonstrates that Ridley, at a minimum, failed to timely return Ecolab/Nalco information in his possession upon his termination, including company information maintained on the WD Drive, his company-issued iPhone,[14] and three Nalco flash drives. Ridley does not dispute the following facts: (1) the WD Drive contained multiple backups of Ecolab/Nalco files from

---

[13] The Court is also skeptical of Ecolab/Nalco's argument that Ridley breached the Ecolab Employment Agreement based on counsel's objection to the scope of Ecolab/Nalco's requested inspection of the WD Drive during discovery. On February 13, 2023, Ecolab/Nalco served a request to inspect the WD Drive pursuant to Rule 34 of the Federal Rules of Civil Procedure. (Doc. 225-4.) On March 14, 2023, Ridley objected to the request to inspect, after which the parties attempted to negotiate agreed terms for inspection. (*See* Docs. 225-6, 225-7, 225-8, 225-9, 225-10, 225-11, 225-12, 225-13.) When those negotiations ultimately proved unsuccessful, Ecolab/Nalco filed a motion to compel (Doc. 224), which the Court granted in part and ordered the parties to meet and confer for the purpose of agreeing on a protocol for inspection of the WD Drive (Doc. 246). Contrary to Ecolab/Nalco's arguments, Ridley did not simply refuse to allow a forensic inspection of the WD Drive as required under the Ecolab Employment Agreement. Rather, Ridley objected to the scope and timing of Ecolab/Nalco's proposed inspection and a discovery dispute arose. Such facts are unlikely to constitute a material breach of the Ecolab Employment Agreement.

[14] Ridley argues that his failure to return this iPhone cannot be considered a breach of the Ecolab Employment Agreement, because Ecolab/Nalco's complaint does not specifically reference the iPhone. The third amended complaint, however, alleges that Ridley breached the Ecolab Employment Agreement by, among other things, "retaining and failing to return Nalco/Ecolab's property and information upon the end of his employment." (Doc. 229, at 55.) Such allegations are more than sufficient to put Ridley on notice that his alleged failure to return company devices are included in the basis for asserting that he has breached the Ecolab Employment Agreement, even if Ecolab/Nalco did not specifically reference the iPhone.

Ridley's company-issued computer (Doc. 255-2, at 530); (2) he possessed three Nalco flash drives containing company information at the time of his termination (*id*. at 514–15); (3) he restored to factory settings his company-purchased iPhone and sold it after his termination (*id*. at 669–72); (4) while working for ChemTreat, he accessed Ecolab/Nalco documents on the WD Drive in August 2021, September 2021, and January 2022 (*id*. at 515–519); (5) while working for ChemTreat, he accessed an Ecolab/Nalco document from the WD Drive while it was connected to his ChemTreat computer (*id*. at 534–35); (6) he sent an e-mail attaching an Ecolab document from his personal e-mail to his ChemTreat e-mail on September 24, 2021 (*id*. at 640–43); and (7) while employed by ChemTreat he deleted Ecolab/Nalco files from the WD Drive (*id*. at 515, 532–33). Even if Ridley forgot that the WD Drive had Ecolab/Nalco documents on it, and even if he forgot about the existence of the three Nalco flash drives containing Ecolab/Nalco files, his actions upon discovering those devices and the information contained therein are entirely inconsistent with his contractual obligation to return all company information to Ecolab/Nalco. To be sure, Ridley likely was not required to forfeit his personally owned WD Drive to Ecolab/Nalco, but the Ecolab Employment Agreement required him to facilitate the return of company information in his possession, which he admittedly did not do given that he accessed Ecolab/Nalco documents on multiple occasions while employed by ChemTreat, deleted certain files, and never notified Ecolab/Nalco about the documents and information still in his possession. Based on these facts, no reasonable jury could find that Ridley substantially complied with the requirements regarding return of Ecolab/Nalco company information upon his termination.

Additionally, Ecolab/Nalco have submitted undisputed evidence that they are entitled to recover attorneys' fees and costs as a result of Ridley's breach of the Ecolab Employment

Agreement.  The Ecolab Employment Agreement expressly states that, "in any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements."  (Doc. 255-2, at 56.)  In responding to Ridley's motion for summary judgment, Ecolab/Nalco submitted an affidavit from counsel representing that Ecolab/Nalco have incurred more than $1,000,000 in attorneys' fees in seeking to enforce their rights and protect their interests in this lawsuit.[15]  (Doc. 305-1, at 2.)  While Ecolab/Nalco is likely not entitled to the entirety of the attorneys' fees billed during the course in this litigation, they have submitted undisputed evidence that they have incurred attorneys' fees in connection with attempting to enforce their rights under the Ecolab

---

[15] The Court notes that, although Ecolab/Nalco have not strictly complied with the Rule 26's requirements regarding initial disclosures, their lack of compliance is harmless under the following facts.  In their initial disclosures, Ecolab/Nalco represented that they were claiming damages and that they would supplement their initial disclosures regarding their computation of damages at a later date.  To the Court's knowledge, Ecolab/Nalco have not supplemented their initial disclosures.  Under Rule 37(c), if a party fails to make a timely disclosure required by Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  In the Sixth Circuit, this rule requires the "automatic and mandatory [exclusion of non-disclosed evidence] unless non-disclosure was justified or harmless."  *Eiben*, 2013 WL 1721677, at *4 (quoting *Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004)).  In assessing whether a non-disclosure is justified or harmless, the Sixth Circuit employs a five-factor balancing test.  The factors include:  (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure.  *Bentley*, 2016 WL 5867496, at *10. The district court should apply the factors as it sees fit and need not apply each one rigidly.  *Id.* Ultimately, the district court retains broad discretion to exclude untimely-disclosed expert-witness testimony.  *Malin v. JPMorgan Chase Bank, N.A.*, No. 3:11-CV-554, 2013 WL 12123511, at *4 (E.D. Tenn. May 7, 2013).  In this case, given that Ecolab/Nalco's complaints have consistently asserted that they are entitled to an award of attorneys' fees and given that the Ecolab Employment Agreement expressly provides for payment of attorneys' fees if they prevail in enforcing their rights under the contract, Ridley cannot legitimately claim surprise as to Ecolab/Nalco's purported claim to attorneys' fees under the contract.  Accordingly, the Court finds that Ecolab/Nalco's failure to include such information in their computation of damages in their initial disclosures is harmless.

Employment Agreement, thereby entitling them to recover at least some portion of their fees and costs as a result of prevailing on their breach-of-contract claim against Ridley.

Accordingly, the Court will grant Ecolab/Nalco's motion for summary judgment on their claim against Ridley for breach of contract and will deny Ridley's cross-motion for summary judgment on Ecolab/Nalco's breach-of-contract claim.

### D.    Breach of Fiduciary Duty

In their third amended complaint, Ecolab/Nalco allege that Ridley violated the fiduciary duty of loyalty he owed to the company by:  (1) failing to disclose knowledge, documents, and data in his possession to a coworker, which impeded Nalco's ability to efficiently service its customers; and (2) preparing a business plan at ChemTreat's request which projected revenue, sales, and growth ChemTreat could expect if it hired him.[16]  (Doc. 229, at 56–58.)  Ridley argues that the Court should grant summary judgment in his favor on Ecolab/Nalco's breach-of-fiduciary-duty claim because he did not breach his fiduciary duty of loyalty by preparing a business plan for ChemTreat and because Ecolab/Nalco have not proffered any evidence of damages resulting from his alleged breaches.  (Doc. 260, at 14–16.)

In Tennessee, to prove a claim for breach of fiduciary duty, a plaintiff must demonstrate that:  (1) a fiduciary relationship exists; (2) the defendant breached of the attendant fiduciary duty; and (3) the plaintiff was injured or the defendant benefited from the breach.  *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010-00188-COA-R3-CV, 2010 WL 493967, at *3 (Tenn. Ct. App. Dec. 3, 2010).  "During the employment relationship, an employee has a fiduciary duty of loyalty to the employer."  *Knott's Wholesale Foods, Inc. v. Azbell*, No. 1A-01-9510-CH-00459,

---

[16] Ecolab/Nalco's third amended complaint expressly states that they are not relying "on facts related to misappropriation of trade secrets" in support of their breach-of-fiduciary-duty claim. (Doc. 229, at 56.)

1996 WL 697943, at *3 (Tenn. Ct. App. Dec. 6, 1996). The duty of loyalty requires an employee to "act solely for the benefit of the employer in matters within the scope of his employment" and "not engage in conduct that is adverse to the employer's interests." *Id*. As the Tennessee Court of Appeals has explained:

> We equate breaches of duty of loyalty with the acts of a traitor. Traditional examples of breaches of loyalty duties in the employment context include acts of an employee in direct competition with the financial, proprietary, or business interests of an employer, thereby placing the personal interests of the employee before those of the employer, the sale or distribution of employer's trade secrets, and a myriad of other destructive acts amounting to more than mere mistaken judgment or negligence.

*Booth v. Fred's Inc.*, No. W2002-01414-COA-R3-CV, 2003 WL 21998410, at *13 (Tenn. Ct. App. Aug. 19, 2003). Proof of damages is an "essential element" of a claim for breach of fiduciary duty. *Union Planters Bank of Mid. Tenn. v. Choate*, No. M1999-01268-COA-R3-CV, 2000 WL 1231383, at * 1 (Tenn. Ct. App. Aug. 31, 2000).

In this case, the undisputed evidence demonstrates that Ridley is entitled to summary judgment on Ecolab/Nalco's breach of fiduciary duty claim because a reasonable jury could not conclude that his preparation of a business plan was a breach of his fiduciary duties and because Ecolab/Nalco have not proffered any evidence that his failure to give information to his replacement at Nalco, Ben Irwin, resulted in any damages to Ecolab/Nalco. During discussions about potential employment with ChemTreat, Clay Cissell asked Ridley: "Hey….could you put together a 3 yr business plan…..nothing fancy just an est[imate] of the $$ you can sell in year one, two and three…..I like using reps estimates to put together their compensation model." (Doc. 255-2, at 240.) Ridley responded with an anticipated sales forecast that does not reference Ecolab/Nalco, their customers, or any information adversely impacting Ecolab/Nalco. (Doc. 275-1, at 11–13.) Ridley's actions do not qualify as acts of a traitor—his sales forecast does not directly compete with Ecolab/Nalco's financial, proprietary, or business interests. Rather, Ridley

provided an estimate of what he thought he could sell if employed by ChemTreat. A salesperson estimating anticipated sales for a potential employer, without any reference to information compromising a current employer, is insufficient evidence for a reasonable jury to conclude such actions constitute a breach of the fiduciary duty of loyalty.

To the extent Ecolab/Nalco maintains that Ridley breached his fiduciary duty of loyalty by failing to give Ben Irwin, his replacement at Nalco, company customer information in his possession, that claim fails because Ecolab/Nalco have not proffered any evidence of damages resulting from Ridley's failure to provide the requested information. First, in their initial disclosures, Ecolab/Nalco stated they "are claiming damages but are in the process of quantifying their damages" and that they would "supplement their Initial Disclosures once the computation is complete." (Doc. 255-2, at 692.) The Court is not aware of any supplemental initial disclosures, but Ecolab/Nalco did disclose Dana Trexler as an expert on damages, and she opined that Ecolab/Nalco suffered damages in the form of Ridley's wages and employer paid benefits for "the period between March 2, 2021, when Ridley sent over his business plan to ChemTreat through his last day of employment with Nalco/Ecolab on July 1, 2021." (Doc. 275-1, at 800.) Trexler's report does not reference Irwin, and, as a result, Trexler's opinions have no bearing on whether Ecolab/Nalco suffered damages based on Ridley's failure to give Irwin company information in his possession. Coupled with Ecolab/Nalco's corporate representative expressly disclaiming any damages or loss "associated with a customer" based on Ridley's alleged breaches of the duty of loyalty (Doc. 255-2, at 422–24.), Ecolab/Nalco have not proffered sufficient information from which a reasonable jury could conclude that they were damaged as a result of Ridley's failure to give Irwin company information he requested.

Accordingly, the Court will grant Ridley's motion for summary judgment on Ecolab/Nalco's claim for breach of the fiduciary duty of loyalty.

### E.    Civil Conspiracy

"The elements of a cause of action for civil conspiracy under Tennessee common law are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage." *Freeman*, 461 F. Supp. 2d at 642 (citing *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)); *Trau-Med*, 71 S.W.3d at 703 ("An actionable conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff."). Liability for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet*, 247 S.W.3d at 186. The effect of a finding of conspiracy is that "each conspirator is liable for damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme." *Trau-Med*, 71 S.W.3d at 703.

To the extent Ecolab/Nalco contends that ChemTreat and Ridley's alleged violations of the TUTSA and the DTSA provide the underlying requisite tort necessary to maintain a civil-conspiracy claim, that claim is preempted. *See Knox Trailers v. Maples*, 581 F. Supp. 3d 1000, at 1020 (E.D. Tenn. 2022.) Additionally, as explained herein, the Court will grant Ridley and ChemTreat's motion for summary judgment on Ecolab/Nalco's claims for tortious interference with contractual relations, procurement of breach of contract, and breach of the fiduciary duty of loyalty. As a result, there is no longer an underlying predicate tort necessary for Ecolab/Nalco to

maintain their civil-conspiracy claim. Accordingly, the Court will grant Ridley and ChemTreat's motion for summary judgment on Ecolab/Nalco's civil-conspiracy claim.

## IV. CONCLUSION

For the reasons stated herein ChemTreat's motion for summary judgment (Doc. 255) is **GRANTED IN PART** and **DENIED IN PART,** Ridley's motion for summary judgment (Doc. 259) is **GRANTED IN PART** and **DENIED IN PART,** Ecolab/Nalco's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART** (Doc. 262). Ecolab/Nalco's motion for summary judgment on their breach of contract claim against Ridley is **GRANTED** to the extent the Court finds that Ridley breached the Ecolab Employment Agreement. Ecolab/Nalco's claims for tortious interference with contractual relations, procurement of breach of contract, breach of the fiduciary duty of loyalty, and civil conspiracy are **DISMISSED WITH PREJUDICE**. Ridley's claims for attorneys' fees under the TUTSA and the DTSA are also **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

_/s/ Travis R. McDonough_
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**